RALPH DeVITTO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Vitto v. Commissioner
Docket No. 5555-77.
United States Tax Court
T.C. Memo 1979-185; 1979 Tax Ct. Memo LEXIS 340; 38 T.C.M. (CCH) 769; T.C.M. (RIA) 79185; May 10, 1979, Filed *340 Petitioner understated his gross business receipts for his taxable year 1969. While conceding the understatement petitioner sought to soften the impact of the resulting added income by claiming additional, but unused, deductible labor expenses for that same taxable year. Held: from all the evidence estimate made of petitioner's increased labor expenses. Henry A. Follen, Jr., for the petitioner. Daniel P. Ehrenreich, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By letter dated April 5, 1977 respondent *341 determined deficiencies in petitioner's income taxes paid and additions to tax under section 6653(b), I.R.C. 1954, for the following taxable years and in the following amounts: Sec. 6653(b) Taxable Year Ended
Deficiency
Addition to Tax
December 31, 1968
$ 1,562.79 $ 781.40
December 31, 1969
99,004.25
49,502.13
December 31, 1970
7,683.92
3,841.96
Respondent has conceded his claimed deficiencies and concomitant additions to tax for petitioner's taxable years ended December 31, 1968 and December 31, 1970. Petitioner has conceded the applicability of the section 6653(b) addition to tax to any deficiency found by us to be owing for his taxable year ended December 31, 1969. After other concessions the only issues left for our decision are whether or not petitioner is entitled to an ordinary deduction in the amount of $87,000 for labor costs for his taxable year ended December 31, 1969 and whether or not respondent's notice of deficiency herein is barred by the applicable statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein *342 by this reference. Petitioner Ralph DeVitto timely filed a joint Federal income tax return for the year in issue with either the district director, Boston, Massachusetts or the North Atlantic Service Center, Andover, Massachusetts. Petitioner's wife, Jeanette DeVitto, is not a party to this action. Petitioner resided in Somerville, Massachusetts at the time the petition herein was filed. Petitioner is the defendant in the criminal case of United States v. Ralph Devitto, Docket No. CR-74-81-G, United States District Court for the District of Massachusetts. In that case petitioner pled guilty to the charge of willfully and knowingly attempting to evade his income taxes for his taxable year 1969 by filing a false and fraudulent return of his income for that taxable year in violation of section 7201. In 1969 and for some years prior thereto, petitioner had been in business as the sole proprietor of a construction company operating under the style of United Construction Company. In 1969 petitioner derived $1,345,991.02 in gross receipts from this construction business. He reported $1,178,973.72 of this amount. Petitioner's resources during the taxable year in issue totaled *343 $1,662,609.70. The sources and elements of this total are shown next below: CHART I
Source of Funds
Savings A/C -- Balances 12/31/68 $ 99,075.96
Business/Personal Checking A/C
Balance 12/31/68
5,367.00
Business Receipts
1,345,991.02
Rental Receipts
5,190.00
Interest Income
6,885.72
Dividend Income
100.00
Loans
200,000.00
Total Source of Funds
$1,662,609.70
By December 31, 1969 petitioner's outlays during that your and cash in hand totaled $1,673,881.89. CHART II
Application of Funds
Savings A/C -- Balances 12/31/69
$ 365,786.30
Business/Personal Checking A/C
Balance 12/31/69
17,846.39
Rental Expenses Excluding
Depreciation
4,388.14
Schedule C Expenses Excluding
Depreciation
1,114,425.40
Estimated Tax Payments
6,800.00
Payments to Bonair Realty Trust [1]
7,000.00
Personal Expenses
Exclusing Preceding $13,800
8,630.66
Loan Repayments
100,000.00
Capital Expenditures [2]
49,005.00
Mortgage Payments -- Rental Property
Unavailable
Total Application of Funds
$1,673,881.89
Unaccounted for Source of Funds $ 11,272.19
*344 Thus we find that petitioner spent or has in bank accounts at the end of 1969 at least $11,272.19 more than his total record assets as of the beginning of 1969 plus his total actual income for that year. Petitioner's problems with his taxable year 1969 began in 1968. On November 6, 1968 fire destroyed much of the Western Junior High School in Somerville, Massachusetts. Petitioner, acting as the United Construction Company, was chosen to be the general contractor in charge of repairing and rebuilding the school. The school has been extensively damaged and was unusable as a result of the fire. This resulted in the necessity of double sessions for students at other schools. Petitioner was under a great deal of pressure to complete the school reconstruction on or before September 1969. Petitioner had in fact agreed to have the school ready for occupation by the beginning of the fall semester in 1969. In obtaining the school reconstruction job petitioner had submitted a bid in which he estimated the total reconstruction costs to be $1,181,238. Of this total petitioner allocated $125,000 to the carpentry work which he estimated would be necessary on the job. While most of *345 the repair work at the school was subcontracted out by petitioner, it was the practice in petitioner's area in 1969 for a job's general contractor to be responsible for the carpentry work himself. Petitioner hired the Pascuccio brothers to rebuild or replace the frames of the damaged portions of the school building and intended to rely upon union labor to apply the "dry-wall" or "sheetrock" to these frames. He paid the Pascuccio brothers $54,000 for their work in framing the school. Petitioner began work on the school sometime in January of 1969. From late February or early March until approximately June of that year there was a carpenters strike which involved all the union carpenters in petitioner's locale. While the Pascuccio brothers were unaffected by the strike, petitioner was unable to obtain union labor for the dry-wall work. About this time petitioner was contacted by, and subsequently contracted with, a French-Canadian nonuion carpenter, known only as Marcel, to supply the labor and tools needed to complete the dry-wall work at the school. Marcel and his men worked at the school job for some months thereafter. Because of the nature of Marcel's involvement in the *346 job he insisted upon and received payment only in cash. Petitioner made cash payments to Marcel for Marcel's work on the school periodically. As mentioned above, petitioner's gross receipts from his construction business totaled $1,345,991.02 in 1969. Petitioner reported only $1,178,973.72 of these gross receipts and fraudulently failed to report the excess. He deducted $1,114,425.40, excluding depreciation allowances, from these gross receipts to report a net profit from his business in 1969 of $58,790.82. Included in the $1,114,425.40 of deductions was $953,982.31 for labor. No comminution of this labor expense deduction was included in the record. Also in 1969 petitioner operated a snow removal service as part of his construction business. During that year petitioner billed the city of Somerville $43,282 for snow removal services. This sum was includable in petitioner's sole proprietorship gross income for that year. The $43,282 billed to the city included petitioner's charge for 2,549 man hours of labor performed by his men in clearing snow. Petitioner paid some of his snow removal workers in cash and some by check. From December 31, 1966 through December 31, 1969 petitioner *347 had accounts in 5 banks at various times, although not necessarily all 5 banks simultaneously. Petitioner's total balance in each bank as of the last days of the years 1966 through 1969 are set out in Chart III. CHART III Bank
Account
12-31-66
12-31-67
12-31-68
12-31-69
Cambridge Savings
8424
$23,211.27
Central Co-op
2385
22,746.42
$23,728.62
$25,325.84
$ 27,262.80
Central Co-op
C.D.327
10,000.00
Central Co-op
C.D.364
10,000.00
Somerville Savings
108638
2,262.93
2,365.87
1,465.31
797.45
Somerset Savings
126932
10,429.45
10,944.08
11,505.13
12,124.45
Middlesex County
069-00254
32,764.43
34,433.59
36,187.80
National
Middlesex Bank, N.A.
067-40958
25,320.05
26,346.09
27,413.80
Middlesex Bank, N.A.
069-01390
42,000.00
Middlesex Bank, N.A.
069-941-051-1C.D.
200,000.00
$58,650.07
$95,123.05
$99,075.96
$365,786.30
Petitioner's total deposits in these accounts thus increased by $36,472.98, $4,952.91, and $266,710,34 between 1966 and 1967, 1967 and 1968, and 1968 and 1969. Petitioner's total interest income of $6,885.72 shown in Chart I above was derived from the following *348 sources: Bank
Account No.
Amount
Middlesex County National
06-941-051-1
$1,894.44
Middlesex County National
069-00254
1,754.21
Somerset Savings
126932
619.32
Somerville Co-op
C.D. #327
262.50
Someville Co-op
2385
1,224.46
Somerville Savings
108638
63.08
Middlesex Bank, N.A.
067-40958
1,067.71
Total
$6,885.72
During 1969 petitioner received two loans of $100,000 each from the Middlesex Bank, N.A. These loans were received in April and December, respectively, of 1969. Petitioner repaid the first $100,000 loan the same month as he received it. The second loan was repaid in 1970. During the year in issue petitioner maintained a safe deposit box at the Middlesex County National Bank. During 1969 he made three visits to that box, on October 21, November 20, and December 9, 1969. During the 6 taxable years 1963 through 1968 petitioner had an average adjusted gross income of $11,687.87. [3] During these same taxable years petitioner claimed depreciation from all sources of an average of $1,737.68 per year. [4] In 1966, 1967, and 1968 petitioner made capital acquisitions of business assets of $9,250, $3,500, and $5,800, respectively. *349 Also in 1965 and 1966 petitioner purchased, and assumed mortgages on, certain rental properties with values of $20,500 and $19,700, respectively. In 1969 petitioner installed two new heating systems in his rental properties at a total cost of $5,900. OPINION This case presents the basic question of whether or not petitioner has substantiated a claimed labor expense deduction. We find that he has done so in part. Petitioner is a general contractor operating under the style of United Construction Company. In December of 1968 or January of 1969 he was awarded a very large contract to rebuild a school partially destroyed by fire. Petitioner estimated the cost of this job to be approximately $1.2 million. Petitioner concedes that he underreported *350 his gross receipts from his business in 1969 by $167,017.30. He concedes that he understated his 1969 gross income, but now seeks to reduce the impact of this added income by claiming an $87,000 deduction for wages allegedly paid by him during 1969 which he had not previously deducted. Petitioner's claim is based on the following theory: He began work on the school in January of 1969. In late February or early March of that year there was a strike of all union carpenters which lasted until approximately June. As the job's general contractor and under his contract with the school board, petitioner was responsible for all the carpentry work to be done at the school. In his original estimate of the cost of the job petitioner had allocated $125,000 to the carpentry work which included two major phases: (1) framing the new or damaged areas of the school, and (2) installing dry-wall or sheetrock on these new frames. The former work was completed by the Pascuccio brothers who were paid $54,000. The second phase, claims petitioner, was completed by a French-Canadian by the name of Marcel and his men. While the Pascuccios were allowed to work under some union exemption, Marcel's men *351 worked inspite of the union. As a result they demanded, and received, purely cash payments from petitioner--who claims to have paid them $70,000 for their work in dry-walling the school building. This $70,000 allegedly paid to Marcel and his men is the greater part of the $87,000 in labor costs petitioner claims he failed to deduct on his 1969 calendar year return. The remaining $17,000, claims petitioner, stems from the unreported labor costs of another division of his business, namely snow removal. In 1969 petitioner was one of those contractors called upon by the city of Somerville to clear the streets of snow as the need arose. During that year petitioner owned certain pieces of machinery designed for this purpose. He testified at the trial herein that it was local practice in 1969 for those men who drove the snow removal equipment to demand, and receive, cash wages. Thus it is petitioner's averment that the remaining $17,000 represents cash payments to transient employees of his snow removal business--which he did not deduct. The core of petitioner's case is that, while his record assets and income in 1969 were insufficient to account for his ability to pay out $87,000 *352 in cash, he possessed in that year a cache of cash adequate to supply this money. It is respondent's position that the record shows that petitioner could not, and did not, possess such a large amount of ready cash as he claims and that, therefore, petitioner lacked the financial ability to pay the claimed expenses. But, argues respondent, even if it be conceded that petitioner possessed such a large amount of cash, he has failed to prove the amounts claimed were actually paid, or if they were, that he has not already deducted them on his return. Petitioner's case rests primarily upon his credibility--and there is much in petitioner's past tax life that would compromise that credibility. Even so, we believe that petitioner has been substantially honest with the Court and we partially allow his claim. It is undisputed that the dry-wall work at the school was successfully completed. Certainly it is beyond per-adventure that, if the work was done, petitioner must have paid for it--there is, to put it colloquially, no such thing as a "free lunch". Further, we have no difficulty in accepting the truth of petitioner's claim that his dry-wall work on the school job was done by *353 a group of French-Canadians under one Marcel. At trial petitioner produced two witnesses, James Brennan, who was mayor of Somerville in 1969, and one of the Pascuccio brothers. Both witnesses testified to the presence of French speaking "dry-wallers" on the job at the same time as the carpenters' strike. This testimony supports petitioner's own testimony with respect to the existence of Marcel and his men. While respondent does not accept petitioner's averments on this point, he offers no alternative theory to explain the fact that the dry-wall work was done and that these witnesses heard French spoken on the job at the relevant time. Thus we conclude that petitioner did employ a group of French-Canadians headed by "Marcel".
Similarly we conclude that petitioner employed men in 1969 as snow removal workers to operate his snow removal machinery, or paid independent contractors for the same work. It is undisputed that petitioner billed Somerville $43,282 for 2,549 man hours of work in 1969. All these hours were attributable to a period of 27 days between February 9 and March 9, 1969. This indicates an average of 94.41 hours per day of labor, or approximately 11.8 mandays of *354 labor per day in snow removal work during that period. During the first quarter of 1969, however, United Construction Co. employed only 8 men, as is shown by its employer's quarterly Federal return, Form 941, for that period. These men were employed as laborers on the school job. It was thus physically impossible for petitioner's own employees to do both jobs. We conclude that petitioner hired, or contracted with, certain unnamed men to perform snow removal work in 1969. From all the evidence we hold that petitioner paid Marcel and his men in cash. Petitioner was in the position of having contracted to rebuild the school so that it could open for the school year beginning in September of 1969. This was the biggest job petitioner had ever had. It was important to his livelihood that he keep his contract with the school board. Then, approximately 1 month into the job, the carpenters went on strike. It was petitioner's obligation, as the job's general contractor, to insure that sufficient skilled labor could be found to complete the job. Yet he could find no union or local labor willing to work. In these circumstances he was approached by Marcel: Marcel would supply the *355 labor and install the dry-wall--no questions asked. In return Marcel demanded, and we believe received, cash pay. The fact that petitioner had $71,000 remaining of his originally estimated $125,000 cost for the school job's carpentry work after paying the Pascuccio brothers suggests support for petitioner's claim that he paid Marcel $70,000. Similar considerations apply to petitioner's temporary snow removal people. Petitioner testified that it was the local custom for these people to demand and receive cash for their services. This custom was confirmed by Mr. Brennan. We conclude that petitioner made some cash payments to these workers. But argues respondent, it would have been impossible for petitioner to pay either group cash because petitioner did not have the cash resources available and unaccounted for in 1969. In support of this argument respondent points to the fact that petitioner spent during 1969, or had deposited in various banks as of the end of 1969, more money than he received during that year or had on hand in banks at the beginning of that year. Further, respondent points to petitioner's low adjusted gross income for the years 1963 through 1968 and the *356 disproportionate (and unexplained) increases in petitioner's bank account deposits in the years 1967 through 1969, inclusive. Respondent argues that these circumstances show that petitioner would not have been likely to have accumulated a cash hoard by 1969. We draw a different conclusion from the record. The fact that petitioner spent or retained in bank accounts as of December 31, 1969 more than he received during that year or had in banks as of the beginning of that year indicates that he had some outside unreported source of cash. Far from indicating the impossibility of petitioner's claimed cash hoard, this spending record indicates to us such a cache's necessary existence. From all the evidence we find that petitioner had a cache of cash available to him in 1969. Having concluded that petitioner paid Marcel and the snow removal crews in cash, we must next face the sticky wicket of whether or not petitioner has already deducted these cash payments. Petitioner deducted $953,982.31 as his cost of labor in 1969. It is repondent's position that petitioner has failed to show that the $87,000 here at issue was not also claimed in that $953,982.31 figure. No clear evidence *357 on this point was included in the record. Possibly the records necessary for petitioner conclusively to prove his case were part of those records petitioner testified he had left at the school and later lost. Obviously we cannot be certain on this point, but we must resolve the matter. After careful consideration of all the evidence as well as petitioner's appearance on the stand, we accept as true petitioner's testimony that he has not previously deducted the entire amount he paid in cash to Marcel and to certain of his snow removal people in 1969. It is plain that any amounts paid to these men were deductible business expenses. The final question then is how much petitioner paid Marcel and the snow removal men. Relevant to our answer to this question is the amount of cash we determine petitioner had available in 1969 to pay Marcel and the snow removal workers. In all, we understand petitioner to claim that he had $85,000 in cash not in banks in 1969; namely, $38,000 which he kept at home and which he had received from his father on behalf of his mother, $10,000 of his wife's money which she kept at home in the form of cash, and at least $37,000 of his own money kept at *358 home or in a safe deposit box. [5]
If this $85,000 is added to petitioner's recorded resources in 1969, we see that these resources totaled $1,747,609.70 ($1,662,609.70 + $85,000) and exceeded his reported outlays for that year and book resources as of the beginning of that year by $73,727.81. If we allocate $8,000 of this amount to petitioner's mortgage payments, food, and miscellaneous expenses, we are left with a surplus of $65,727.81. We accept petitioner's claim that he possessed considerable cash during 1969 but we conclude that he had available only this $65,727.81 for payments to the dry-wallers and snow removal workers. Applying the hoary principles of Cohan v. Commissioner,39 F.2d 540 (2nd Cir. 1930), we hold that petitioner paid but failed to deduct $50,000 in deductible labor expenses in 1969. Petitioner's claim that he was protected by the statute of limitations is easily disposed of. Since he has admitted that his 1969 Federal income tax return was fraudulent and filed with the intent to evade tax, it is clear that the *359 statute never began to run on that taxable year. Section 6501(c)(1). Since petitioner did not pursue other claims made in his petition, we conclude that they have been conceded. Decision will be entered under Rule 155.
Footnotes
1. During 1969 petitioner was a shareholder in two realty trusts, Grandview Realty Trust and the Bonair Realty Trust. During that year he was assessed, and paid, $7,000 into Bonair. ↩
2. While the parties stipulated this amount to equal $43,105.00, they failed to include in their total petitioner's purchase of heating systems for his rental houses in 1969 totaling $5,900.↩
3. Petitioner's reported adjusted gross income for the years 1963 through 1968 was as follows: ↩ Year
Adjusted Gross Income
1963
$ 8,355.90
1964
11,866.81
1965
13,754.45
1966
11,971.17
1967
12,728.56
1968
11,450.33
4. ↩
Depreciation Year
Business
Rental
1963 $ 260.60
1964
260.60
1965
363.10
1966 $ 655.00
1,171.10
1967
1,915.00
1,466.60
1968
2,867.50
1,466.60
5. This total does not include $42,000 petitioner claims to have received on behalf of his brother in December of 1969.↩